IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| Healthcare Ventures of Ohio, LLC, et al., | : | |
| | : | Case No. 20-cv-04991 |
| Plaintiff(s), | : | |
| | : | Chief Judge Algenon L. Marbley |
| v. | : | |
| | : | Magistrate Judge Chelsey M. Vascura |
| HVO Operations Windup LLC, et al. | : | |
| | : | |
| Defendant(s). | : | |

**OPINION & ORDER**

## I.     INTRODUCTION

This matter is before the Court for consideration of Plaintiffs' Motion to Remand. (ECF No. 7). Defendants oppose the Motion to Remand. (ECF No. 9). Plaintiffs also moved this Court for a Motion for Temporary Restraining Order and Motion for Preliminary Injunction. (ECF No. 3). For the reasons set forth orally on the record at the Local Rule 65.1 Conference held on October 13, 2020, and summarized below, Plaintiffs' Motion to Remand is **GRANTED**.

## II.     BACKGROUND

### A.  Procedural History

There are two separate lawsuits at play: the CARES Act Lawsuit (Case No. 20-cv-4901) and the instant lawsuit (Case No. 20-cv-4991). The procedural history for each suit is summarized below.

### 1.  The CARES Act Lawsuit

On September 18, 2020, the CARES Act defendants, Healthcare Ventures of Ohio ("Healthcare Ventures") and Paul M. Dauerman, filed a Notice of Removal from the Common Pleas Court of Franklin County, pursuant to 28 U.S.C. § 1441(a). (Notice of Removal, *Autumn Court Operating Company LLC, v. Healthcare Ventures*, No. 20-4901 (S.D. Ohio Sept. 18, 2020),

ECF No. 1)). The CARES Act plaintiffs are the operators of eleven skilled nursing facilities in Ohio (the "Facilities[1]") and are eligible to receive Medicare funds and the CARES Funds. (*Id.* at ECF No. 5 at 2). On September 21, they filed a Motion for Temporary Restraining Order and Preliminary and Permanent Injunction. (*Id.* at ECF No. 5). This Court denied that Motion. (ECF No. 12).

The CARES Act dispute concerns $1.19 million of funding provided by the U.S. Department of Health and Human Services ("HHS"), as part of the Coronavirus Aid, Relief, and Economic Security Act ("CARES"). The CARES Act authorized a monetary distribution to Medicare- and Medicaid- certified nursing home providers. ((Press Release, U.S. Dep't of Health and Hum. Servs, HHS Announces Allocations of CARES Act Provider Relief Fund for Nursing Homes) (Aug. 7, 2020)). The payment distribution is targeted to help nursing homes with COVID-19-related expenses for testing, staffing, and personal protective equipment supplies. (*Id.*). Defendants are Healthcare Ventures of Ohio LLC and its president, Paul Dauerman. Health Prime One, Inc. ("Health Prime One") and NH Management Corporation ("NH Management") later become defendants to the CARES Act suit as well.

After this Court denied the TRO request, the plaintiffs in the CARES Act lawsuit amended their Complaint to add HVO Operations Windup, LLC ("HVO Operations Windup"), HG Property Service Corp. ("HG Property"), First Ohio Investors I, LLC ("First Ohio"), Ralph Hazelbaker, and Greggory St. Clair as plaintiffs. (Motion for Leave to File Amended Motion for Preliminary Injunction, *Autumn Court Operating*, No. 20-4901 (ECF No. 16)).

---

[1] Autumn Court Operating, LLC, Brookview Operating Company, LLC, Columbus Alzheimer's Operating Company, LLC, Cridersville Skilled Nursing Facility Operating Company, LLC, Dublin Convalarium Operating Company, LLC, Gardens at Celina Operating Company, LLC, Gardens at Paulding Operating Company, LLC, Gardens at St. Henry Operating Company, LLC, Heatherdowns Operating Company, LLC, McCrea Operating Company, LLC, Oak Grove Manor Operating Company, LLC.

*2. The Instant Lawsuit*

The instant lawsuit swaps the parties, such that the CARES Act plaintiffs are the Defendants, and the CARES Act defendants are the Plaintiffs.

On September 23, 2020, Defendants HVO Operations Windup, HG Property Service Corp., First Ohio Investors, Ralph Hazelbaker, and Greggory St. Clair removed the instant lawsuit to this Court from the Franklin County Court of Common Pleas.

That same day, Plaintiffs Healthcare Ventures, NH Management, Health Prime One, and Mr. Dauerman, filed a Motion for Temporary Restraining Order and Motion for Preliminary Injunction. (ECF No. 3). Plaintiffs asked this Court to issue injunctive relief against Defendants to prevent them from engaging in any fashion purportedly by or on behalf of Healthcare Ventures.

On September 24, Plaintiffs filed a Motion to Remand. (ECF No. 7). Defendants' Response and Plaintiffs' Reply followed. (ECF Nos. 9, 10).

## B. Factual Background

Plaintiffs are Healthcare Ventures, Health Prime One, and NH Management. (ECF No. 7 at 1). Healthcare Ventures is the parent company to the other two organizations. Paul Dauerman is the sole shareholder of these two companies and is the president and CEO of Healthcare Ventures. (*Id.* at 4). Mr. Dauerman formed Healthcare Ventures in 2005 to serve as nursing home operating facilities. (*Id.* at 5).

Defendants are HVO Operations Windup LLC ("HVO Operations Windup"), HG Property Services Corp. ("HG"), First Ohio Investors I, LLC ("First Ohio"), Ralph Hazelbaker, and Greggory St. Clair. (*Id.* at 3). Defendant Ralph Hazelbaker controls each of these three corporations and is president of Defendants HG and First Ohio. Mr. St. Clair is the president of HVO Operations Windup. (*Id.*).

3

Plaintiffs allege the following: On September 3, 2020, Defendant St. Clair entered First Financial Bank, which held depository accounts of Plaintiff Healthcare Ventures, (*Id.* at 2), presented fraudulent corporate resolutions purporting to show that he was president of *Plaintiff* Healthcare Ventures, that he should be added as a signatory to the papers, and that $1.7 million should be wired out of the account. (*Id.*). Mr. St. Clair allegedly was accompanied by attorney Rick L. Brunner. The attempt included wiring $500,000 to Brunner's firm account and wiring $1,191,700 to an account that had been fraudulently opened at Huntington National Bank in the name of Healthcare Ventures, without its knowledge or consent. (*Id.*). Because bank personnel knew the real president of Plaintiff Healthcare Ventures, Plaintiff Dauerman, they refused to comply allegedly with the requests. (*Id.*). According to Plaintiffs, Mr. St. Clair's actions were on behalf of Defendant Hazelbaker, attorney Brunner's client. (*Id.*). Plaintiffs ask this Court to enjoin the Defendants from taking any further action purportedly in the name of Healthcare Ventures. (*Id.* at 3).

### 1.  The Subleases

In 2005, Plaintiff Healthcare Ventures entered into three almost identical subleases ("Subleases") through which it became the operator of the nursing home facilities ("Facilities"). (*Id.*). The Facilities were owned by companies owned or controlled by Ralph Hazelbaker and members of his family ("Hazelbaker Entities"). (*Id.* at 6). Plaintiffs represent that the business relationship was mutually beneficial for fifteen years—rent was paid on time, and there were never assertions of default. (*Id.* at 4).

### a.  Expiration of Subleases and Sale of Facilities

The Subleases were set to expire on May 31, 2020. (*Id.* at 6). In February 2019, Plaintiff Healthcare Ventures was informed that the Hazelbaker Entities intended to sell the nursing homes.

(*Id.*). Plaintiff Healthcare Ventures provided notice in November 2019 that the Subleases would not be renewed. (*Id.*). In the following months, the Hazelbaker Entities negotiated with a potential purchaser, but the pandemic caused challenges to securing that contract. (*Id.*).

Mr. Dauerman agreed to a one-month extension of the Subleases' term so that there would not need to be a change of operator if the prospective purchaser backed out of the purchase transaction at the last minute (which is what ended up occurring). (*Id.*). This moved the Subleases' expiration date to June 30, 2020. (*Id.*). Once the sale negotiations collapsed, the Hazelbakers formed new companies to serve as the new operators for each Hazelbaker nursing home. (*Id.*). The patriarch of the Hazelbaker family is Ralph Hazelbaker. (*Id.*).

### 2.   *1661 Old Henderson Road, LLC*

In 2005, contemporaneous with the Subleases, Peregrine Health Services, Inc. ("Peregrine") was formed to provide management services to Healthcare Ventures for operating the Facilities. (ECF No. 3 at 4, n.2). Plaintiff Dauerman is also the sole owner of Peregrine. Separate from the nursing home Subleases, Plaintiff Healthcare Ventures and Peregrine leased office space on a month-to-month basis from a Hazelbaker company, 1661 Old Henderson Road, LLC ("1661 Old Henderson Road"). (*Id.* at 5). Again, by July 1, 2020, Plaintiff Healthcare Ventures was no longer the operator of the Facilities. (*Id.*). On that day, Plaintiffs allege that Ralph Hazelbaker, members of his family, and/or his counsel were involved in locking out Mr. Dauerman, Healthcare Ventures, and Peregrine employees from their business office. (*Id.*). Plaintiffs further allege that Ralph Hazelbaker, members of his family, and or/his counsel ransacked the offices by going through file cabinets, desk drawers, and computers—which allegedly were all the property of Plaintiff Healthcare Ventures or Peregrine. (*Id.*).

Plaintiff companies secured a court order from Judge William Woods, ordering the Hazelbakers to allow Mr. Dauerman and his employees into the premises to determine what happened. (*Id.*). Plaintiffs report that Mr. Dauerman found that his desk had been rifled through and that Hazelbaker attorney Rick K. Brunner personally took possession of a document on Mr. Dauerman's desk and later published it. (*Id.*). Plaintiffs also allege that PPE inventory belonging to Healthcare Ventures or Peregrine at the time when PPE was in short supply and was needed by Healthcare Ventures for other nursing homes. (*Id.*).

### 3.  *Articles of Incorporation for HVO Operations Windup*

Rick L. Brunner and the firm of Brunner Quinn are counsel for Defendant Hazelbaker and Hazelbaker entities and has been so for many years. (*Id.* at 6). On August 30, 2020, a paralegal in Mr. Brunner's office signed Articles of Incorporation for a new company known as HVO Operations Windup, LLC ("HVO Operations Windup"). (*Id.*). Plaintiffs say that "HVO" is commonly known to mean Healthcare Ventures of Ohio, i.e., the Plaintiff in this case. Yet, Plaintiff Dauerman did not give anyone authority to form HVO Operations Windup, even though he is the sole shareholder of Healthcare Ventures. (*Id.* at 3.). The Articles of Incorporation for HVO Windup state that the purpose is "winding up the affairs of Healthcare Ventures, LLC." (*Id.* at 6).

On September 3, 2020, Defendants Ralph Hazelbaker and Greggory St. Clair (the husband of a long-time employee of the Hazelbaker Entities) each signed a separate set of allegedly fake corporate minutes, entitled "Minutes of Actions Taken in Writing in Lieu of a Special Meeting by the Members of Healthcare Ventures of Ohio, LLC." (*Id.* at 7). Plaintiffs say that the true members of Healthcare Ventures did not take action in lieu of a meeting that day, however, and that Mr. Dauerman did not know of or authorize anything like this. The allegedly fake minutes also include allegedly fake resolutions:

6

(1) Appointing HVO Operations Windup as the new manager of my company, Healthcare Ventures;

(2) Appointing Greggory St. Clair as the new president of my company, Healthcare Ventures;

(3) Electing a new slate of officers of Healthcare Ventures, including not only Greggory St. Clair, but also Sandy St. Clair, Rose Antonio, and Cheryl Friend – all Hazelbaker employees (except Greggory St. Clair); and

(4) Changing the statutory agent of Healthcare Ventures to Saris Corp., a captive entity of the Brunner Quinn law firm which share the same address.

(*Id.* at 7.).

On that same day, the Brunner Quinn firm filed allegedly with the Ohio Secretary of State a form changing the statutory agent of Plaintiff Healthcare Ventures to Saris Corp. so that any official mail or service made upon the statutory agent of Healthcare Ventures would go to Mr. Brunner's law firm. (*Id.* at 7). Brunner Quinn's paralegal signed the change of statutory agent. (*Id.*).

### 4. *First Financial Bank*

On September 4, 2020, Plaintiff Dauerman was informed by an officer of First Financial Bank, which holds significant depository accounts of Healthcare Ventures, that, on the previous day, a person identified as "Greg St. Clair" came into the bank and presented several documents to bank personnel. (*Id.*). These documents include the above-referenced fake minutes, representing that there was a change of ownership of Healthcare Ventures, that Mr. St. Clair was to be added as a signatory to the accounts of Healthcare Ventures, and asked that $1.7 million be wired out of a Healthcare Ventures' depository account in two separate wire transfer of funds. Plaintiffs say that a bank videotape shows that both Mr. St. Clair, and Rick L. Brunner were present at the bank on September 3. (*Id.* 7-8).

One of the two wire requests made by Mr. St. Clair was for $500,000 to be sent to an account at First Merchant's Bank in the name of the Brunner Quinn law firm. (*Id.* at 8). The other

wire request was in the amount of $1,191,700, which is the exact amount Healthcare Ventures received as part of the CARES Act. (*Id.*). That wire request was to an account at Huntington National Bank that was opened in the name of Healthcare Ventures of Ohio, LLC. (*Id.* at 2, 8). As described above, the CARES Act is at the heart of the dispute between the parties in the other case, 20-cv-4901.

### 5. The Pledge Agreement

In 2005, like the Subleases discussed earlier, the same parties entered into a "Stock and Ownership Interests Pledge Agreement" ("Pledge Agreement"). (ECF No. 3 at 8). The Pledge Agreement provided that it could only be triggered upon the occurrence of an "Event of Default." (*Id.* at 8-9). Plaintiffs say that in the entire fifteen-year history of the contractual arrangements between Mr. Dauerman's companies and the Hazelbaker Entities, the pledgees to the Pledge Agreement never asserted a default event. (*Id.* at 4, 8, 9).

Plaintiffs argue strongly that the Pledge Agreement—like the Subleases—expired on June 30, 2020. (*See id.* at 8). In support of that argument, Plaintiffs point to § 18 of the Pledge Agreement, which provides that the Pledge Agreement terminates upon: (1) termination of the Sublease; (2) payment and satisfaction of a certain "Loan Agreement" and "Promissory Note;" and (3) payment or satisfaction of "all other obligations under the Related Agreements. (*Id.* at 9).

Plaintiffs contend that all of these conditions have been fulfilled: (1) the Subleases terminated on June 30, 2020; (2) the Loan Agreement and Promissory Note were paid and satisfied years ago; and (3) an example of a Related Agreement given in this section is an account services agreement, discussed more below. (*Id.* at 9).

Plaintiffs claim that Defendant Hazelbaker's attorneys do not dispute the first two items but instead assert that there remain obligations to be performed under item three—the other

"Related Agreements"—and that, therefore, the Pledge Agreement has not yet expired. (*Id.* at 9-10). Plaintiffs argue that, before the events of September 3, 2020, Plaintiff Dauerman never received notice from Mr. Brunner or any of the Hazelbaker entities indicating a failure to perform any obligation under any Related Agreement that has not been performed. (*Id.*).

### 6.  *The Cease and Desist Letters*

On September 8 and 10, 2020, cease and desist letters were sent to counsel for the Hazelbaker entities and Defendants St. Clair and HVO Operations Windup, demanding that they stop taking actions in the name of Healthcare Ventures. (*Id.* at 10). The recipients of these letters, Plaintiffs report, have not responded. (*Id.*).

### III.    STANDARD OF REVIEW

Federal district courts have original jurisdiction "of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. Removal of cases from state to federal court is governed by 28 U.S.C. § 1441(a), which provides that "any civil action brought in state court of which the district courts of the United States have original jurisdiction may be removed by the defendant or the defendants to the district court of the United States . . . where such action is pending." Moreover, "the party asserting jurisdiction 'must carry throughout the litigation the burden of showing that he is properly in court.'" *Serras v. First Tennessee Bank Nat. Ass'n,* 875 F.2d 1212, 1215 (6th Cir. 1989), (quoting *McNutt v. General Motors Acceptance Corp. of Indiana*, 298 U.S. 178, 189 (1936)).

Already before this Court is a lawsuit brought by eleven nursing home facilities against Healthcare Ventures and Mr. Dauerman related to funds distributed by HHS under the CARES Act. That lawsuit is Case No. 2:20-cv-04901. The case *sub judice*, conversely, relates to claims

involving events surrounding Mr. St. Clair going to First Financial Bank on September 3, 2020, in an alleged attempt to have the bank wire $1.7 million out of Healthcare Ventures' account.

The question here is whether the substantial-federal-question doctrine provides federal subject-matter jurisdiction over a state-law claim on the basis that a nested element of that claim pertains to federal law. A state law cause of action may arise under federal law, even without a private right of action, so long as the claim's right-to-relief depends upon federal law. *Shulthis v. McDougal*, 225 U.S. 561 (1912). The presence of a federal issue in a state law cause of action does not, ipso facto, imbue the claim with federal-question jurisdiction.

## IV.    LAW & ANALYSIS

"The Supreme Court has developed a standard, through an evolving case line, by which the federal interest in providing a forum for an issue is weighed against the risk that the federal courts will be unduly burdened by a rush of state law cases." *Mikulski v. Centerior Energy Corp.*, 501 F.3d 555, 566 (6th Cir. 2007). This Court reviews two precedent-setting cases, *Merrell Dow* and *Grable*, below.

First, in the seminal *Merrell Dow Pharmaceuticals Inc. v. Thompson*, 478 U.S. 804 (1986), plaintiffs sued a drug company under state law. Plaintiffs alleged that the company was presumptively negligent under the federal Food, Drug, and Cosmetic Act's branding requirements. The Court disagreed and found federal jurisdiction unavailable. In so holding, it found persuasive the strength of the federal interest at stake and implications of opening the federal forum. *Id.* at 812 ("[It] would . . . flout, or at least undermine, congressional intent to conclude that federal courts might nevertheless exercise federal-question jurisdiction and provide remedies for violations of that federal statute solely because the violation . . . is said to be a . . . 'proximate cause' under state law.").

10

The Supreme Court had another opportunity to clarify this standard in *Grable & Sons Metal Products, Inc. v. Darue Engineering & Manufacturing*, 545 U.S. 308, 310-11 (2005). In interpreting *Merrell Dow*, the Court introduced the "welcome mat" metaphor:

> One only needed to consider the treatment of federal violations generally in garden variety state tort law . . . A general rule of exercising federal jurisdiction over state claims resting on federal [ ] statutory violations would thus have heralded a potentially enormous shift of traditionally state cases into federal courts. Expressing concern over the increased volume of federal litigation, and noting the importance of adhering to legislative intent, *Merrell Dow* thought it improbable that the Congress, having made no provision for a federal cause of action, would have meant to welcome any state-law tort case implicating federal law solely because the violation of the federal statute is said to create a rebuttable presumption of negligence under state law. In this situation, no welcome mat meant keep out. *Merrell Dow*'s analysis thus fits within the framework of examining the importance of having a federal forum for the issue, and the consistency of such a forum with Congress's intended division of labor between state and federal courts.

*Id.* at 318-19 (internal quotation marks omitted). A federal court can hear claims recognized under state law, so long as the embedded federal issue is substantial enough to support jurisdiction. A "substantial" federal question involves the interpretation of a federal statute that actually is in dispute in the litigation and is so important that it "sensibly belongs in federal court." *Id.* at 315.

Emerging from *Merrell Dow* and *Grable* is the following test used to assess the relative significance of the federal interest in a state-law case: First, the state law claim must necessarily raise a federal issue that is actually disputed. Second, the federal interest in the issue must be substantial and central to the case. Third, the exercise of federal jurisdiction must not "distort any division of labor between the state and federal courts, provided or assumed by Congress." *Grable*, 545 US at 310. Here, the question presented is whether the absence of a federal cause of action to try claims under the CARES Act precludes removal to federal court of a state action. The three *Grable* factors are reviewed below.

1. *Raises a Disputed Federal Issue*

11

The first factor asks whether the underlying state cause of action raises a stated federal issue that is actually disputed. In other words, the parties must "cross swords over" a federal issue that two competing interpretations are asserted. *Mikulski*, 501 F.3d at 569. Defendants argue federal jurisdiction is proper for two related reasons.

First, Defendants posit that this Court has independent federal jurisdiction to hear the instant lawsuit because a decision will turn inevitably on an interpretation of the CARES Act. Second, Defendants contend that the above-mentioned Pledge Agreement itself raises a stated federal issue because the contractual language mandates compliance with federal and state laws. (*See* ECF No. 10 at 4 (explaining the Pledge Agreement requires Plaintiffs' compliance with "all laws, regulations, rules, orders . . . and standards of any federal . . . and other government entity . . . applicable to the . . . operation of a Facility.")).

Plaintiffs retort that their claims do not raise or implicate a federal statute. Plaintiffs raise three claims:

- Count One: judgment declaring that the Defendants' activities are unlawful under Ohio law, including that Defendants had no legal authority to create document in Healthcare Ventures' name and no legal authority to create a new bank account in Healthcare Ventures' name;

- Count Two: that the Defendants committed identity fraud under Ohio statutes; and

- Count Three: that a certain Hazelbaker Entity should be declared a sham corporation with its corporate veil pierced under Ohio law so that Ralph Hazelbaker is liable for all actions of that company, which is at the center of the September 3, 2020 events at First Financial Bank.

12

Accordingly, Plaintiffs argue that none of these claims implicates the CARES Act or any other federal statute. Instead, the issue here is whether Defendants' actions were lawful under Ohio law.

This Court finds that the underlying state cause of action does not raise a stated federal issue that is actually disputed. Nothing in Plaintiffs' Complaint indicates that resolution of this matter would turn on applying the CARES Act. None of Plaintiffs' three counts implicates the CARES Act or any other federal statute or regulation. In fact, federal law is irrelevant to the legal relief sought.

And because the clause in the Pledge Agreement is a defense that Defendants raise, it cannot itself be a basis for federal question jurisdiction. It is axiomatic that a defense cannot form the basis of federal jurisdiction. *Merrell Dow*, 478 U.S. at 808 ("A defense that raises a federal question is inadequate to confer federal jurisdiction."); *Morris v. Shaw*, No. 2:19-CV-1339, 2019 WL 5307314, at *1 (S.D. Ohio Oct. 21, 2019) ("Mr. Morris raises a garden-variety tort claim—a negligence claim—involving a collateral federal issue, that Medicare has paid some of his medical bills. It is indisputable that Mr. Morris has not raised a federal cause of action. At best, Mr. Morris's invocation of Medicare would have been relevant to any defense CMS might have brought. This is insufficient for federal jurisdiction.").

Setting aside the fact that the Pledge Agreement is raised as a defense—and thus cannot be a basis for federal jurisdiction—Defendants' argument on the agreement fails for another reason. The suggestion that the Pledge Agreement's contractual clause mandating compliance with federal law thereby grants federal jurisdiction is mandatory is specious. Accepting Defendants' argument would allow federal courts to review nearly any contract that requires compliance with federal laws: a plainly untenable standard.

13

Most importantly, the parties do not "cross swords over" the CARES Act, further indicating

that the complaint does not raise a disputed federal issue. *See Mikulski*, 501 F.3d at 569. Rather,

the CARES Act is the center of the dispute in the *other* litigation between these parties. At best,

the CARES Act is peripheral to Plaintiffs' claims arising under state tort and corporations' law.

Accordingly, the first prong does not favor jurisdiction.

### 2.  Substantial Federal Issue

The second factor analyzes the substantiality of the federal interest. This prong, in turn, has

three sub-prongs, whether: (1) the case includes a federal agency, particularly whether that

agency's compliance with the federal statute is in dispute; (2) the federal question is important

(i.e., not trivial); (3) a decision on the federal question will resolve the case (i.e., the federal

question is not merely incidental to the outcome); and (4) whether a decision on the federal

question will control numerous other cases (i.e., the issue is not anomalous or isolated). *Mikulski*,

501 F.3d at 570. As is typical of any balancing test, no one factor is dispositive.

Defendants urge that there is no question that the stated federal issue relating to the CARES

Act Funds and the bank account holding funds is disputed and substantial, as both sides are

claiming entitlement to the funds and entitlement to the bank account. Plaintiffs disagree, based

on an analysis of the four sub-prongs. This Court reviews these arguments below.

### a.  Does the Case Include a Federal Agency?

The first factor weighs against finding the federal interest as substantial because there is

no federal agency in this dispute. Plaintiffs do not allege that a federal agency failed to follow the

law. Rather, the issue here relates to contracts between private individuals and companies and the

resultant claims under state tort law. *Mikulski*, 501 F.3d at 570 (explaining in a tax matter, "the

federal government . . . has only a limited interest in private tort or contract litigation"). That

14

HHS oversees the distribution of the CARES Act funds is not relevant to this dispute. Plaintiffs do not, for example, argue that the department has acted in a manner contrary to law.

### b.   Is the Federal Question Important?

The second factor is whether the federal question is important and not trivial. The issues raised in any given case are of extreme importance to the particular parties. But precedent requires that the questions raised be important to the federal judicial system as a whole. *Gunn v. Miton*, 568 U.S. 251 (2013). Here, there is little evidence that applying federal law to the alleged conduct will implicate broader or more substantial federal issues. *See Mikulski*, 501 F.3d at 570-71. The laws on identity theft, identity fraud, and corporations from which Plaintiffs' claims emerge are fairly particular and routine aspects of state tort law. It would be an overstatement to say that there is *no* federal interest, though it is very much peripheral to this dispute.

This factor weighs against the substantiality of the federal interest.

### c.   Will a Decision on the Federal Question Resolve the Case?

The third factor is whether a decision on the federal question will resolve the case. Even if Defendants prevail on their contention that Plaintiffs violated or contravened the CARES Act, Plaintiffs still must prove the remaining elements of identity theft identity, identity fraud, and piercing the corporate veil. The CARES Act does not speak on these questions. Thus, the federal question is merely incidental to the outcome of the matter.

### d.   Will a Decision on the Federal Question Control Numerous Other Cases?

The fourth factor is whether resolution of this question will control or prevent future cases. In other words, this factor looks to whether the federal issue is anomalous or isolated, or, conversely, has some precedent-setting potential. This is a more nuanced, subjective analysis than

15

the previous three sub-prongs, requiring this Court to ask whether the case might be a potential

source of precedent on any federal question.

In the best of times, judicial forecasting should be done with considerable restraint. In the

context of the global pandemic, this task has grown all but impossible. Perhaps the very nature of

the CARES Act, as a pandemic relief measure, renders an otherwise insignificant federal interest

more substantial. Given that federal pandemic relief is likely to continue and that suits filed in state

and removed to federal court will inevitably follow, the question presented here will probably be

relevant to those later-filed cases. The possibility that this case is a potential source of precedent

notwithstanding, "[w]hether the interpretation of [the federal law at issue] is resolved in state court

or federal court, the outcome will be the same . . . and it is of no consequence . . . whether this

case, or any like it, is resolved in federal court rather than the state court." *Mikulski*, 501 F.3d t

571-72. This factor also favors remand.

In sum, this Court finds that each of the four factors indicates that the federal interest in

this matter is not substantial. As the Sixth Circuit said, "[t]his is not to say that there is no federal

interest or even some significant federal interest; there may very well be, and it might not be

difficult to find. But such a finding would be immaterial. The pertinent finding, which leads to

our present conclusion, is that the federal interest in this case is not 'substantial' as that term has

been defined under the prevailing Supreme Court precedent." *Id.* at 572 (collecting cases).

### V. Balance of State-Federal Responsibilities

The third and final *Grable* factor is whether the exercise of jurisdiction would disrupt

impermissibly the congressionally approved balance of federal and state judicial responsibilities.

*Grable*, 545 U.S. at 315.

Defendants argue that the dispute is hearable by the federal courts and emphasize that the CARES Act lawsuit is already before this court. Splintering this litigation will upset the federal-state court balance by having parallel cases, both seeking contradictory declaratory judgments, pending contemporaneously. Plaintiffs argue that Defendants attempt impermissibly to use the CARES Act lawsuit to create federal jurisdiction in this lawsuit.

There is, however, no "welcome mat" here, given the absence of a private cause of action under the CARES Act. *Profiles, Inc. v. Bank of Am. Corp.*, No. CV SAG-20-0894, 2020 WL 1849710, at \*7 (D. Md. Apr. 13, 2020) ("The Court is not persuaded that the language of the CARES Act evidences the requisite congressional intent to create a private right of action."). Allowing federal question jurisdiction to exist would implicate the Supreme Court's concern that it was "improbable that the Congress, having made no provision for a federal cause of action, would have meant to welcome any state-law tort case implicating federal law solely because the violation of the federal statute is said to create a rebuttable presumption of negligence under state law." *Mikulski*, 501 F.3d at 573 (citations omitted). "In this situation, no welcome mat meant keep out." *Id.*

The absence of a private cause of action is not outcome determinative. This Court must also consider the risk of opening the federal courts to litigation that could be handled just as well in state courts. Congress has long evidenced an intention to have state courts hear matters that are the typical province of state law. Plaintiffs' claims are, at their core, premised upon state tort and corporate law. Because the state court in which this suit was filed is just as "competent to apply federal law, to the extent it is relevant," the federal-state balance would be upset by allowing a federal court to hear this inherently state-law case. This final *Grable* element is not satisfied either.

17

Applying the substantial-federal-question test elements to the present case demonstrates there is no disputed federal issue in this case.

### A.  Supplemental Jurisdiction

Defendants contend that because this case comes within the scope of the Court's original jurisdiction, then supplemental jurisdiction attaches as well. But because this Court just determined that no original federal question jurisdiction exists, no supplemental jurisdiction attaches either. *Howard v. Huntington Nat. Bank*, No. 2:09- CV-251, 2010 WL 3743542, at *3 (S.D. Ohio Sept. 22, 2010) ("Supplemental jurisdiction, however, is predicated upon original subject matter jurisdiction in the district court. Because Mr. Howard's complaint does not present a federal question, this Court lacks jurisdiction under 28 U.S.C. § 1331, and there can be no supplemental jurisdiction either.").

### B.  Payment of Fees

The remaining question is whether Plaintiffs are owed attorney's fees and costs incurred while compelling remand to state court. The award of attorney's fees for challenging removal is dependent on the objective reasonableness of the basis for removal: "[T]he standard for awarding fees should turn on reasonableness of the removal. Absent unusual circumstances, courts may award attorney's fees under § 1447(c) only where the removing party lacked an objectively reasonable basis for seeking removal." *Martin v. Franklin Capital Corp.*, 546 U.S. 132 (2005).

Defendants argue that this Court should not award attorney's fees because removal is objectively reasonable. And attorney's fees after a remand should be denied "when an objectively reasonable basis exists." *Warthman v. Genoa Twp. Bd. of Trs.,* 549 F.3d 1055, 1060 (6th Cir. 2008). Where the removal was not objectively reasonable, district courts are to "consider this

18

underlying purpose when they exercise their discretion." *Id.* Only "objectively unreasonable removals should result in fee awards to plaintiffs." *Id.*

Additionally, Courts should consider whether "unusual circumstances warrant a departure from the rule in a given case." *Id.* (citations omitted). Defendants say that removal is objectively reasonable because the party sought to decrease the needless costs of cumulative litigation proceeding in state and federal court.

There is no evidence that the removal of the action was made in bad faith, and given the extensive analysis required to resolve the removal issue, this Court does not find that Defendants' motion was objectively unreasonable. Thus, this Court will not award attorneys' fees.

## VI.    CONCLUSION

The Court thus **GRANTS** Plaintiffs' Motion to Remand to the Court of Common Pleas for Franklin County, Ohio. (ECF No. 7).

   **IT IS SO ORDERED.**

_____
**ALGENON L. MARBLEY**
**CHIEF UNITED STATES DISTRICT JUDGE**

**DATED:  November 13, 2020**